111 W. 57th Inv. LLC v 111 W57 Mezz Inv. LLC

2026 NY Slip Op 03376

May 28, 2026

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

111 West 57th Investment LLC, et al., Appellants,

v

111 W57 Mezz Investor LLC, et al., Defendants, ACREFI Mortgage Lending, LLC, et al., Respondents, et al., Defendants.

Decided on May 28, 2026

No. 41

Haley N. Proctor, for appellants.

Gary J. Mennitt, for respondents ACREFI Mortgage Lending, LLC, et al.

Steven Sinatra, for respondents Spruce Capital Partners LLC, et al.

Wilson, Chief Judge:

[*1]

Plaintiff, the largest equity investor in a project to acquire and develop a luxury residential tower in New York City, appeals the dismissal of its claims for breach of the implied covenant of good faith and fair dealing and tortious interference with contract. Because plaintiff sufficiently pleads a claim of implied breach of the covenant of good faith and fair dealing, we reinstate that claim and remit to the Supreme Court for further proceedings not inconsistent with this decision. We otherwise uphold the dismissal of the tortious interference claims.

I.

A.

Plaintiff, 111 West 57th Investment LLC, invested $65 million in equity to acquire and develop property at 111 West 57th Street in New York City into a luxury residential tower (the "Project"). Plaintiff invested in the Project alongside two other entities, Atlantic 57 LLC and 111 West 57th Sponsor LLC ("Sponsor"). Sponsor is a special purpose vehicle by which the Project's developers invested in and managed the Project. To facilitate the Project, plaintiff, Atlantic 57 LLC, and Sponsor formed the entity 111 West 57th Partners LLC (the "Joint Venture") and signed a Joint Venture Agreement (the "JVA") that articulated each member's rights and obligations.

To finance the project, the Joint Venture obtained $725 million in loans, $325 million of which came from a mezzanine loan issued by certain "Apollo" entities FN1. On January 3, 2017, Apollo sent a notification letter recounting that on "numerous occasions" it had informed the borrowers that the mezzanine loan was out of balance due to budget overruns. The second amended complaint alleges that by February 2017, but perhaps as early as the summer of 2016, certain defendants had discussed and agreed on an "internal deal" to use a strict foreclosure process to extinguish plaintiff's equity in the Project even though the Project was expected to be immensely profitable. With the $325 million [*2]mezzanine loan in technical default, in March 2017, Apollo and the Joint Venture reached a forbearance agreement by which the $325 million mezzanine loan was split into a $300 million senior mezzanine loan and a $25 million junior mezzanine loan, both held by Apollo. The junior mezzanine loan was governed by the Junior Mezzanine Loan Agreement (the "Loan Agreement"), between the Joint Venture and Apollo. The Loan Agreement detailed that the junior mezzanine loan was secured by the Joint Venture's equity interest in the Project, the majority of which was plaintiff's equity investment. In conjunction with the Loan Agreement, the parties also executed a Pledge and Security Agreement (the "Pledge Agreement")FN2. The Pledge Agreement gave Apollo the right to "assign its interest in the [junior mezzanine loan] in accordance with the Loan Agreement." The Loan Agreement, in turn, stated that the Apollo entities "shall have the right to . . . assign other direct or indirect interests in the [junior mezzanine loan] or Loan Documents. . . in such amounts as deemed appropriate by [Apollo] to one or more Persons," subject to certain limitations regarding who that assignee may be. Moreover, the Loan Agreement provided:

"Whenever pursuant to this Agreement, [Apollo] exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to [Apollo], the decision of [Apollo] to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of [Apollo] and shall be final and conclusive."

Other parts of the Loan Agreement similarly stated that Apollo's "rights, powers, and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as [Apollo] may determine in [Apollo'] sole discretion.

Also in March 2017, Apollo began conversations with Spruce Capital Partners LLC, Joshua Crane, and Robert Schwartz (collectively, "Spruce") regarding a potential assignment of the junior mezzanine loan by Apollo to Spruce at its $25 million par value. Apollo provided Spruce with financial models showing approximately $600 million in cash flow to equity if Spruce exercised its statutory right of strict foreclosure under the self-help provisions of the Uniform Commercial Code ("UCC"). In a strict foreclosure, the Joint Venture would have to relinquish all collateral—here the Joint Venture's equity—and in return the junior mezzanine loan would be extinguished. In a public auction foreclosure, on the other hand, any surplus equity above the amount owed to Spruce would remain with the Joint Venture. The models from Apollo, in other words, showed that the value of the equity in the Project, which Spruce could participate in through a strict foreclosure, was much greater than the $25 million price at which Spruce would purchase the junior mezzanine loan.

On June 28, 2017, Apollo assigned the junior mezzanine loan to Spruce at the planned $25 million par value. Spruce created 111 W57 Mezz Investor LLC to assume the $25 million loan. Two days later, on July 30, 2017, Spruce issued a notice of default and sought to foreclose on the junior mezzanine loan. On July 7, 2017, Spruce accelerated the junior mezzanine loan and informed the Joint Venture that Spruce would take the Joint Venture's, including plaintiff's, equity in the Project in exchange for extinguishing the $25 million junior mezzanine loan via a strict foreclosure under UCC, absent objection. Pursuant to UCC 9-620, the Joint Venture had twenty days to object to the strict foreclosure.

Plaintiff attempted to object to the strict foreclosure, invoking the "Major Decision" provision of the JVA. Sponsor asserted that under these circumstances plaintiff had no rights under the "Major Decision" provision and disputed any objection to the strict foreclosure FN3. Plaintiff then filed an unsuccessful emergency bid seeking to enjoin the strict foreclosure. Ultimately, the strict foreclosure went forward, and the Joint Venture's pre-foreclosure equity, including both plaintiff's and Sponsor's equity, was wiped out. Plaintiff alleges, however, that Sponsor had negotiated a deal with Spruce by which Sponsor both remained on the Project as developer and was afforded "carry over" equity.

B.

In July 2017, when plaintiff filed its unsuccessful emergency bid to stop the strict foreclosure, it also filed several claims against Spruce, including a claim for breach of the implied covenant of good faith and fair dealing ("the implied covenant") of the Pledge Agreement. In July 2018, plaintiff added claims against Apollo for tortious interference and aiding and abetting a breach of fiduciary duty. The crux of plaintiff's claims is that Apollo, Spruce and Sponsor all colluded in a "backroom deal" to cut plaintiff out of the Project's capital structure and together profit from plaintiff's relinquished equity. Both Apollo and Spruce moved to dismiss. Supreme Court dismissed plaintiff's claim for a breach of the implied covenant against Spruce as well as all then-existing claims against Apollo. Thereafter, the Appellate Division modified the order, determined that plaintiff had sufficiently pleaded breach of the implied covenant against Spruce, but dismissed all remaining claims (192 AD3d 618, 621 [1st Dept 2021]).

In September 2021, plaintiff filed a second amended complaint and added several causes of action including, as relevant here, (i) a claim for breach of the implied covenant of the Pledge Agreement against Apollo and (ii) claims of tortious interference with the JVA against both Apollo and Spruce. Apollo and Spruce again moved to dismiss. Supreme Court dismissed the tortious interference claims, stating that although the claims were cognizable, plaintiff failed to allege malice or fraud sufficient to overcome the economic interest defense. However, Supreme Court held that plaintiff stated a viable claim for breach of the implied covenant against Apollo.

On appeal, the Appellate Division modified Supreme Court's order, dismissing the claim for breach of the implied covenant against Apollo but otherwise affirming (220 AD3d 435 [1st Dept 2023]). The Court reasoned that because Apollo had the absolute right to assign the junior mezzanine loan in its sole discretion, the covenant of good faith and fair dealing could not override that contractual right (id. at 436). With respect to the tortious interference claims, the Court held that plaintiff did not show that Apollo and Spruce were the "but for" cause of the Sponsor's decision not to object to the strict foreclosure and that plaintiff's brief was "devoid of any explanation of how [Sponsor] breached the implied covenant in the" JVA (id. at 437). We granted leave to appeal (42 NY3d 912 [2025]).

II.

Every contract contains an implied covenant of good faith and fair dealing (see Singh v City of New York, 40 NY3d 138, 145 [2023]; see also Kalisch-Jarcho, Inc. v City of New York, 58 NY2d 377, 384 [1983] ["As is true of contracts generally, implicit in the present one was the obligation of fair dealing"]; Kirke La Shelle Co. v Paul Armstrong Co., 263 NY 79, 87 [1933] ["in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing"]). The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Singh, 40 NY3d at 145-146). Said simply, "the covenant requires the parties to perform under the contract in a reasonable way" (Cordero v Transamerica Annuity Serv. Co., 39 NY3d 399, 409 [2023] [internal quotations omitted]). Even "[w]here [a] contract contemplates the exercise of discretion," the implied covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion" (Dalton v Educ. Testing Serv., 87 NY2d 384, 389 [1995]; see also Cordero, 39 NY3d at 409—410).

However, "the implied covenant is not without limits" (Singh, 40 NY3d at 146). Courts will imply a covenant "only in aid and furtherance of other terms of the agreement of the parties" (id. [internal citations omitted]). It is a heavy burden to succeed on such a claim, because the plaintiff eventually must prove "that the particular unexpressed promise [*3]sought to be enforced is in fact implicit in the agreement when viewed as a whole" (id., 40 NY3d at 145-146 [internal citations omitted]). In evaluating such a claim, "the Court looks to what the parties would have expected under the contract: the Court will infer that contracts 'include any promises which a reasonable person in the position of the promisee would be justified in understanding were included' at the time the contract was made" ' (Cordero, 39 NY3d at 409 [quoting Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69 [1978]).

In this case, plaintiff alleges that Apollo violated the implied covenant under the Pledge Agreement by assigning the junior mezzanine loan to Spruce as a part of a "backroom deal" intended to push plaintiff out of the Project's capital structure and benefit from the windfall of equity that would flow to Spruce (and others, including Apollo) thereafter. Assuming without deciding that Apollo had "sole discretion" to assign to the junior mezzanine loan under the terms of the Pledge Agreement and Loan Agreement, we disagree with the Appellate Division's conclusion that such discretion exculpated Apollo from the implied covenant. We instead hold that the second amended complaint sufficiently alleged a claim against Apollo for breach of the implied covenant.

A.

The Appellate Division's dismissal of the implied covenant claim against Apollo rested on that Court's view that Apollo's absolute discretion to assign the junior mezzanine loan negated any implied covenant with respect to assignment of the junior mezzanine loan. Its decision relied on First Department cases that are in tension not only with other First Department decisions, but also with the general consensus among the other Departments, which instead hold a party cannot exercise discretion in a way that frustrates another party's rights under the contract (compare Tr. Funding Assoc., LLC v Capital One Equip. Fin. Co., 149 AD3d 23, 29 [1st Dept 2017] ["Where a contract allows one party to terminate the contract in its sole discretion and for any reason whatsoever, the covenant of good faith and fair dealing cannot serve to negate that provision" (internal quotation marks omitted)] and Cambridge Investments LLC v Prophecy Asset Mgt., LP, 188 AD3d 521, 522 [1st Dept 2020] ["Defendant cannot breach the covenant of good faith and fair dealing if the contract gives it sole and complete discretion"]; with Greenland Asset Mgt. Co. v MicroCloud Hologram, Inc., 244 AD3d 528, 529 [1st Dept 2025] ["Even assuming that defendant had some discretion under the contract to refuse plaintiff's request as unreasonable, even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement" (internal quotation marks omitted)]; Gutt v N. Am. Partners in Anesthesia, LLP, 237 AD3d 1063, 1066 [2d Dept 2025] [upholding a claim of breach of implied covenant of good faith and fair dealing at summary judgment stage, despite defendant's sole discretion to act as it had]; Ahmed Elkoulily, M.D., P.C. v New York State Catholic Healthplan, Inc., 153 AD3d 768, 770 [2d Dept 2017] ["Even if a party is not in breach of its express contractual obligations, it may be in breach of the implied covenant of good faith and fair dealing when it exercises a contractual right as part of a scheme to deprive the other party of the benefit of its bargain"]; Scheer v Elam Sand & Gravel Co., 177 AD3d 1290, 1291 [4th Dept 2019] [holding that because "defendant had the discretion to terminate the lease only if it made a prior (discretionary) determination . . . the implied covenant of good faith and fair dealing included a promise to exercise that discretion in good faith, not arbitrarily"]; and Gizara v New York Times Co., 80 AD3d 1026, 1028 [3d Dept 2011] [holding that defendant's sole discretion to review refund claims "did not give defendant the right to act arbitrarily or in bad faith when reviewing the refund claims"]).

We concur with the prevailing view among the Appellate Division departments—that a party's "sole discretion" with respect to a right does not exculpate that party from complying with the implied covenant with respect to that right.FN4,FN5[*4]Although "parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party . . . [t]here exists an unavoidable tension between the concept of freedom to contract . . . and the equally fundamental belief that an enlightened society must to some extent protect its members from the potentially harsh effects of an unchecked free market system" (Rowe v Great Atl. & Pac. Tea Co., Inc., 46 NY2d 62, 68 [1978]). In light of those competing interests, "rightly or wrongly, society has chosen to intervene in various ways in the dealings between private parties," for example by "mandating the express or implicit inclusion of certain substantive or procedural provisions in various types of contracts" (id.). Indeed, one of those implicit substantive provisions is the implied covenant, which has the primary purpose of ensuring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," when that conduct is "inconsistent with the other terms of the contractual relationship," and yet not negotiated for in advance (Dalton, 87 NY2d at 389).

This doctrine is even more important "where a contract contemplates the exercise of discretion," or in other words awards one party the freedom to act in ways the contract may not directly foresee (id.)FN6. Accordingly, the implied covenant obligates the party with discretion act in good faith, and "not [] arbitrarily or irrationally," when "exercising that discretion" (id.). A promisor's discretion may not be used to violate a promise that "a reasonable person in the position of the promisee would be justified in understanding w[as] included" (511 W. 232nd Owners Co. v Jennifer Realty Co., 98 NY2d 144, 153 [2002] [quoting Rowe, 46 NY2d at 69]).

Finally, our decision is consistent with Delaware law, which has repeatedly held that "[t]he implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party" (Glaxo Group Ltd. v DRIT LP, 248 A3d 911, 920 & n 46 [Del 2021] [collecting cases]; see also Charlotte Broadcasting, LLC v Davis Broadcasting of Atlanta, L.L.C., 2015 WL 3863245, at *7 [Del Super Ct June 10, 2015], affd, 134 A3d 759 [Del 2016] ["The implied covenant particularly applies where the contract permits a party to exercise sole discretion. Delaware case law requires a party to exercise such discretion reasonably and in good faith"]; Cygnus Opportunity Fund, LLC v Washington Prime Group, LLC, 302 A3d 430, 460 [Del Ch 2023] ["When a party has sole discretion to make a decision, that setting provides more reason for the implied covenant to apply, not less"]).

In this case, the Loan Agreement contains certain restrictions as to whom Apollo could assign the loan, naming a few specifically identified companies as ones to whom Apollo could not sell or assign the loan. The dissent's view rests entirely on the premise that because Apollo and plaintiff negotiated certain restrictions as to whom Apollo could assign the loan, but did not negotiate a restriction that would cover Apollo's behavior alleged here, the Court, by reading in an implied promise, acts contrary to the terms of the Agreement. However, the fact that the parties identified and agreed to certain entities to whom the loan could not be assigned does not suggest that the parties thereby authorized Apollo to assign the loan to anyone else for a fraudulent purpose or in bad faith—which is what plaintiff alleges.

Suppose, for example, the New York City Housing Authority (NYCHA) signs a contract with a painting company to repaint interiors of the more than 3,000 apartments in Queensbridge Houses, and assigns the painting company sole [*5]discretion regarding painting the walls, but specifies that the company may not use black, brown or orange FN7. If the painter elects to paint obscene or racist words on the walls, but without using black, brown or orange, NYCHA would have a claim for breach of the implied covenant of good faith and fair dealing, despite the painting company's sole discretion under the contract. The painting company's sole discretion must be carried out in a way that is consistent with the fruits of the contract—improvement of the apartments as residences for low-income tenants. It does not matter if the parties already negotiated certain restrictions with respect to a party's sole discretion because the implied covenant's very purpose is to cover that which is not anticipated and yet incompatible with the object of the contract when viewed as a whole, regardless of that sole discretion.

Similarly, a restriction on who is not a restriction on how. Even if the Loan Documents granted Apollo the absolute right to assign the junior mezzanine loan to whomever it wanted, without obtaining approval, that authority should not insulate Apollo from other forms of liability that might arise from the manner in which it exercised that unilateral right FN8. Apollo's right to assign the junior mezzanine loan did not permit assignment [*6]of the loan in a manner that would destroy plaintiff's right to receive the fruits of the contract as a result of a fraudulent scheme, as alleged here. Implying a restriction that the junior mezzanine loan may not be assigned in this way is not "at odds with [the Pledge Agreement]'s express grant of discretionary power," (dissenting op at 8 [quoting In re January [*7]2021 Short Squeeze Trading Litig., 76 F4th 1335, 1348 (11th Cir 2023)]—it is completely consistent with the other terms, and overall purpose, of the Pledge Agreement.

"[I]nstitutional concern[s] for stability" and the avoidance of "market uncertainty" would be disserved by the dissent's approach, which would allow "well-represented, sophisticated parties" to invoke a sole discretion clause to destroy the fundamental object of a contract (dissenting op at 17). The implied covenant exists to preserve the benefit of the bargain against bad faith acts taken by one party that do not violate an express term included in the contract. That it may not exist in Texas, as the dissent points out, is of no moment here, and is not likely to cause parties to flee New York. Our decision in no way changes New York law. It applies well-settled principles to the allegations before us.

B.

"Under our well-established liberal pleading standards, we assume all facts asserted in the complaint to be true" (34-06 73, LLC v Seneca Ins. Co., 39 NY3d 44, 51 [2022]), "accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]). "[U]nlike on a motion for summary judgment where the court searches the record and assesses the sufficiency of the parties' evidence, on a motion to dismiss the court merely examines the adequacy of the pleadings" (Cortlandt St. Recovery Co. v Bonderman, 31 NY3d 30, 38 [2018] [internal quotations omitted]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (id.). Under our liberal pleading standard, plaintiff's second amended complaint sufficiently pleads a cause of action for breach of the implied covenant.

Plaintiff alleges that Apollo "violated the implied covenant of good faith and fair dealing and therefore breached their obligations under the Pledge Agreement by assigning the Pledge Agreement to Spruce as part of the backroom deal." To support those allegations, plaintiff highlights that Apollo prepared detailed projections for Spruce showing that by purchasing the $25 million junior mezzanine debt at par (which, presumably, would be expected be sold for less than par because the loan was in default), Spruce would acquire plaintiff's equity in the Project, "worth millions of dollars more than the debt it secured, based on contemporaneous financial models created and distributed by [Apollo], which show over $600 million in cash flow to equity on project sellout." In fact, plaintiff emphasizes that, based on Apollo's models, Spruce thereafter explained the deal to its own investors as a purchase of equity by means of strict foreclosure, rather than one of debt, and noted it was "taking advantage of a messed-up partnership." These assertions, if proven, help illuminate why merely two days after purchasing the junior mezzanine loan Spruce sent a notice of default, followed by a notice of its intent to strictly foreclose on the debt, effectively converting it into equity by seizing plaintiff's equity in the Project.

Moreover, plaintiff points to Apollo's continued cooperation in the "backdoor deal," as even after the strict foreclosure by Spruce, "[T]he loan remained out of balance, so once Spruce acquired the Collateral, it would need forbearance from . . .Apollo [and other lenders] while it raised additional debt or equity to cure the out of balance condition," and that such a forbearance agreement was signed the same day that Spruce sent its foreclosure notice to plaintiff. Finally, plaintiff repeatedly alleges that Apollo "sought to suborn [Sponsor] not to object to the strict foreclosure proposal," because the decision by Sponsor to not object to the strict foreclosure in favor of a public auction, where Sponsor might have had a chance to maintain some portion of its equity, was nonsensical absent some promise of future equity or other emolument. That inducement, plaintiff alleges, included a promise that Sponsor could remain on the deal as the construction manager and carry over its equity on the condition that it did not object to the strict foreclosure.

At bottom, accepting the second amended complaint's allegations as true and making all reasonable inferences from those allegations in plaintiff's favor, the pleading is sufficient to state a claim that Apollo breached the implied covenant in the Pledge Agreement. The purpose of the Pledge Agreement was to facilitate the forbearance of the original mezzanine loan from Apollo, such that the construction of the Project could continue and that the Joint Venture's equity investment in the Project, including plaintiff's $65 million investment, remained unimpaired FN9. The Pledge Agreement [*8]and Loan Agreement were intertwined. As such, a reasonable party in plaintiff's position would have understood that the Pledge Agreement included a promise by Apollo not to use its discretion under the Pledge Agreement to collude in a "backdoor deal" that stripped plaintiff of its position as an equity participant in the Project—the very equity the forbearance agreement was intended to protect FN10. By implying such a promise, we recognize an obligation that was [*9]implicit in the Pledge Agreement. Allegations of this kind, which deprive parties of the benefits of the contract, are precisely what the implied covenant is intended to safeguard against.FN11

III.

Plaintiff also appeals the dismissal of its claims for tortious interference of the JVA against both Apollo and Spruce. Although the second amended complaint limited that tortious interference claim to interference with the "Major Decisions" clause of the JVA, plaintiff does not challenge that dismissal on appeal. Instead, plaintiff challenges the lower courts' rulings regarding its contentions that Apollo and Spruce tortiously interfered with Sponsor's obligations under the JVA by suborning Sponsor's participation in the alleged "sham" strict foreclosure. Supreme Court treated that allegation as if it had been included in the second amended complaint without the need for a formal motion, received additional briefing, and subsequently ordered that the claim be dismissed on the ground that the complaint facially established that Apollo and Spruce are insulated by the economic interest defense. The Appellate Division agreed that the tortious interference claims should be dismissed, but on the alternative bases that plaintiff failed to sufficiently plead both (i) that defendants were the "but for" cause of the Sponsor's decision not to object to the strict foreclosure, and (ii) an underlying claim for breach of the implied covenant in the JVA. We affirm the dismissal of the tortious interference claims against both defendants on the ground that they are insufficiently pleaded.

***

Plaintiff has sufficiently pleaded a claim against Apollo for breach of the implied covenant of good faith and fair dealing in the Pledge Agreement. The purpose of the Pledge Agreement was to facilitate the continued construction of the Project, and to safeguard the Joint Venture's investment therein. Accepting all facts in the second amended complaint as true, and according plaintiff the benefit of every possible inference, we hold that plaintiff has sufficiently alleged that Apollo colluded in a scheme to deprive plaintiff of the benefit of its bargain. Even if Apollo had the sole discretion to assign the junior mezzanine loan, doing so as part of an alleged backdoor deal to appropriate the value of plaintiff's equity by conspiring with others to facilitate the scheme states a legally cognizable claim for breach of the implied covenant.

Accordingly, the order appealed from and so much of the Appellate Division order brought up for review should be modified, without costs, by reinstating the second cause of action of the second amended complaint and remitting to Supreme Court for further proceedings on that cause of action and, as so modified, affirmed.

GARCIA, J. (Dissenting In Part):

Prior to today's decision, a party in plaintiff's situation seeking to invoke the implied covenant of good faith and fair dealing had a high bar to clear, as New York courts interfered with the freedom of contract between well-represented parties in complex commercial transactions only in the most extraordinary circumstances. No longer. Instead, the majority, analogizing the parties to the junior mezzanine financing agreement at issue here to a city agency hiring a painting company and a student signing up to take a standardized test, holds that the covenant may be used to rewrite the specific terms of a multi-million-dollar construction loan agreement contract based on a court's notion of fair play. The majority does this even though plaintiff has failed to allege that the assignment of the loan—the basis for the breach of the implied covenant of good faith claim—was in any way necessary to complete the "backroom deal" that plaintiff claims stripped it of equity in the project. Going forward, allegations that offend a court's sensibilities will be sufficient to make out a claim that there was a covenant of good faith intended to prevent those acts.

This Court has long recognized that a stable body of sophisticated commercial law helped make New York the preeminent commercial center in the world and, conversely, that meddling with the rules governing commercial transactions jeopardized that standing. Today, we abandon that institutional regard for stability and predictability. This majority's reimagining of New York law will disrupt the expectations of contracting commercial parties, making uncertain the rights and liabilities in billions of dollars of outstanding loan agreements, and may well affect whether similarly situated parties will choose to subject themselves to New York law. I dissent.

I.

In December 2013, plaintiff 111 West 57th Investment LLC, the investment vehicle of AmBase Corporation, entered into a joint venture with 111 West 57th Sponsor LLC ("Sponsor")—the special-purpose entity through which non-parties Michael Stern and Kevin Maloney managed and directed the project—and Atlantic 57 LLC, to acquire and develop the property at 105-111 West 57th Street into a luxury residential tower (the "Project"). The three members formed 111 West 57th Partners LLC ("Partners") as the joint venture vehicle, and their respective rights and obligations are set forth in Partners' Amended and Restated Limited Liability Company Agreement (the "JVA"). Plaintiff contributed over $65 million in equity to the venture. Sponsor was designated the manager and was vested with "day-to-day authority to act for the Company," subject to certain "Major Decisions" requiring plaintiff's prior written consent, including "any financing or refinancing." The JVA also contained an expansive "Waiver of Fiduciary Duties" clause.

In June 2015, the joint venture, through its subsidiaries, obtained $725 million in construction financing: a $400 million mortgage loan from American General Life Insurance Company and affiliates; and a $325 million mezzanine loan from ACREFI Mortgage Lending, LLC and Apollo Credit Opportunity Fund (together, "Apollo") to 111 West 57th Holdings LLC ("Holdings"), secured by Holdings' 100% membership interest in the property owner. Both loan agreements contained assignment clauses giving the Lender broad discretion to assign the loan or portions of the loan subject to certain bargained-for limitations. With funding in hand, work on the project began.

Construction of what plaintiff describes as "the world's skinniest residential building" in the heart of Manhattan apparently entailed some risk, and that risk was realized when cost overruns of approximately $57 million caused the mezzanine loan to fall out of balance. In February 2017, Apollo demanded a shortfall contribution from Holdings of approximately $56 million. That contribution went unpaid, the deadline passed, and the loan went into default. As a result, the $400 million mortgage loan also went into default.

In March 2017, Holdings entered into a forbearance agreement with Apollo. At that time, Apollo exercised its contractual right under the operative loan agreement to "modify, split and/or sever any portion of the Loan," dividing the $325 million original mezzanine loan into a $300 million Senior Mezzanine Loan, on which Holdings remained the obligor, and a $25 million Junior Mezzanine Loan with 111 West 57th Mezz 1 LLC ("Borrower")—a wholly-owned subsidiary of Partners. The Junior Mezzanine Loan was governed by the Junior Mezzanine Loan Agreement and secured [*10]by the Pledge and Security Agreement ("Pledge Agreement"), under which Borrower pledged its 100% membership interest in Holdings as collateral. Repayment was further secured by a guaranty executed by Sponsor's owners, Stern and Maloney, under which they would become personally liable to repay the Junior Mezzanine Loan if any of them attempted "in bad faith . . . to materially delay any foreclosure against the Collateral, or any other exercise by Lender of its remedies under the Loan Document." The forbearance period, originally set to expire in March, was extended until June 29, 2017.

In June 2017, with Borrower still in default and the forbearance period ending, Apollo assigned the Junior Mezzanine Loan to an entity controlled by Spruce Capital Partners ("Spruce"). Two days later, Spruce issued a notice of an event of default. Spruce then sent Borrower a notice under UCC 9-620 proposing to accept the collateral in full satisfaction of the $25 million Junior Mezzanine Loan—a procedure known as a "strict foreclosure." Sponsor declined to cause Borrower to object to this process, pointing to the guaranty, and claiming no good faith reason to do so. Accordingly, the collateral was transferred to Spruce in satisfaction of the debt but still subject to the $756 million in outstanding senior loans and cost overruns.

Plaintiff commenced this action in July 2017. The operative complaint contains allegations of a "backroom deal" among Apollo, Spruce, and Sponsor, in which Sponsor's failure to object to the strict foreclosure proposal was procured through promises of continued employment and a future opportunity to re-invest in the project. Two claims are at issue here. The first is a derivative claim, brought on behalf of Partners and the Borrower, against Apollo, claiming Apollo breached the implied covenant of good faith and fair dealing in the Pledge Agreement "by assigning the Pledge Agreement to Spruce as part of the backroom deal." The second claim is for tortious interference with the JVA against Spruce and Apollo.

Supreme Court dismissed the tortious interference claims but permitted the implied covenant claim against Apollo to proceed (111 West 57th Investment LLC v 111 W57 Mezz Investor LLC, 2022 NY Slip Op 34258[U] [Sup Ct, NY County 2022]). The Appellate Division modified by dismissing the implied covenant claim against Apollo and otherwise affirmed (111 W. 57th Inv. LLC v 111 W57 Mezz Inv. LLC, 220 AD3d 435, 436 [1st Dept 2023])FN1.

II.

Plaintiff alleges that Apollo's act of assigning the Junior Mezzanine Loan to Spruce violated an implied covenant of good faith and fair dealing in the Pledge Agreement. The relevant assignment clause permits Apollo, in its sole discretion, to assign the loan and reduce or eliminate risk, with certain bargained-for limits on that right. The parties negotiated two schedules of "prohibited transferees"; one effective prior to any default with a list of seven entities and one effective after any default that reduces that number to three. That specific claim, that the assignment of the loan breached the implied covenant, is at issue here.

As a general rule, "[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance . . . embrac[ing] a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002] [internal quotation marks and citations omitted]). Equally important, however, is the caveat that no obligation inconsistent with other terms of the contract can be implied (see Murphy v Am. Home Prods. Corp., 58 NY2d 293, 304 [1983]). "The burden of proving an implied promise falls on the plaintiff" and that burden is a heavy one, "for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists" (Cordero v Transamerica Annuity Serv. Corp., 39 NY3d 399, 410 [2023] [internal quotation marks and citation omitted])FN2. We apply these rules to determine if application of the covenant would negate the terms of the clause [*11]at issue or, even if it would not, to see if such application is necessary to prevent one party from "destroying or injuring the right of the other party to receive the fruits of the contract" (511 W. 232nd Owners Corp., 98 NY2d at 153 [internal quotation marks and citations omitted]; see also Erk, 11 NY3d at 456-459 [implied covenant could not limit plain text of contractual language]). Under our traditional approach, plaintiff fails to meet its heavy burden of demonstrating an implied promise here.

As an initial matter, I agree that the granting of "sole discretion" to the lender is not the final word on whether we should imply the covenant of good faith and fair dealing here (see majority op at 10-11). I do not, however, agree with the majority that the "doctrine" of reading in the implied covenant "is even more important '[w]here the contract contemplates the exercise of discretion' " (majority op at 11, quoting Dalton v Educational Testing Serv., 87 NY2d 384, 389 [1995]). The majority's approach, namely that the more discretion you bargain for, the more likely the covenant of good faith will be applied to limit it, is particularly inapt here. The case the majority purports to extrapolate this rule from, Dalton, involved a student seeking to have the covenant applied to a clause outlining the score review process in a testing service's standardized form agreement (87 NY2d at 387-389). Even more telling is the majority's illustration of its principle using the "example" of "the New York City Housing Authority" contracting with a painting company (majority op at 13-14).

Plaintiff, represented by experienced counsel, invested $65 million in a joint venture and, pursuant to the terms of the JVA, approved nearly a quarter of a billion dollars in construction loans, including the Junior Mezzanine Loan arrangement. I believe the appropriate view in these circumstances is to acknowledge the tension between our conclusion that the covenant of good faith and fair dealing can restrict a term granting a party sole discretion and our rule that we will not imply an obligation inconsistent with an express contract term (see Murphy v Am. Home Prods. Corp., 58 NY2d at 304; In re January 2021 Short Squeeze Trading Litigation, 76 F4th 1335, 1348 [11th Cir 2023]). In practice, this means "that 'courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement' " (id., quoting Third Story Music, Inc. v Waits, 41 Cal App 4th 798, 808 [1995]).

Turning first to the clause at issue, examples of the application of that balanced approach are found in the decisions of other courts considering the covenant in the context of an assignment clause granting broad discretion to lenders. The decisions from those courts are instructive both for the clarity they bring to the issue and for highlighting the flaws in the majority's analysis.

In the first such case, a federal court applying New York law considered a contract that prohibited the assignment of the loan to certain of the borrower's competitors (see Empresas Cablevision, S.A.B. de C.V. v JPMorgan Chase Bank, N.A., 680 F Supp 2d 625, 626-628 [SD NY 2010], affd in part and remanded 381 Fed Appx 117 [2d Cir 2010] [remanding on the scope of the injunction]). When the lender attempted to evade that bargained-for restriction by structuring a "participation" that gave a prohibited competitor "much of the substance of the forbidden assignment," the court held that the implied covenant was breached because the maneuver "purposely undercut what [the lender] knew the assignment veto was designed to prevent" (id. at 631-632; see Kirschner v JP Morgan Chase Bank, N.A., 79 F4th 290, 307 n 92 [2d Cir 2023] ["In a typical loan participation, a single institution originates the loan, and then sells [*12]ownership interests to one or more participating banks"] [internal quotation marks and citation omitted]). This was "not permissible" because the action taken by the lender "[did] away with the fruits of the contract" by accomplishing in substance precisely what the parties had expressly forbidden, namely assignment of the loan to a prohibited entity (id. [internal quotation marks and citation omitted]). The "maneuver" that evaded the bargained for restriction was the participation agreement that constituted a de facto assignment. Reading the implied covenant of good faith into the contract there did not contradict the assignment clause; on the contrary, it was necessary to provide the borrower with the fruits of the negotiated bargain, which was that the lender not transfer the loan to a competitor.FN3

In Norte v WorldBusiness Capital, Inc., the court rejected the borrower's argument that the lender breached the covenant of good faith by assigning the loan to the borrower's biggest competitor shortly after the lender-initiated foreclosure proceedings (2015 WL 7730980 *10 [SD NY 2015]). The Norte court held that "[i]n the absence of a provision prohibiting assignment to a specific party," the lender—"engaged in a commercial transaction and ow[ing] no special duty to its borrower"—was "permitted to assign the loan to whomever it wished" (Norte, 2015 WL 7730980 at *10). The only breach of contract theory that was allowed to proceed was that the lender, prior to assignment, and later the assignee, each allegedly violated the substantive provision of the loan contract requiring disclosure of certain information needed by borrower to cure its default (id.). In other words, reading the implied covenant into the contract would negate the bargained-for terms of the assignment clause and in any event was not necessary to render the contract enforceable, since plaintiff could pursue remedies for substantive claims that each defendant breached other contract provisions.

Both courts looked to the alleged act constituting the breach and the purpose of the assignment clause, its text, and any negotiated limits on its scope in determining whether the lender's actions did away with the fruits of the contract (see id.; Empresas, 680 F Supp 2d at 632). Plaintiff's argument here, when subject to the same analytical approach, must be rejected.

As to purpose, the assignment clause benefits the lender, allowing it to reduce risk by assigning, in its discretion, all or a portion of the loan. Given that purpose, it is doubtful that anything in it is intended, even in part, for Borrower's benefit (see Cordero v Transamerica Annuity Serv. Corp., 39 NY3d 399, 409-411 [2023] [expressing doubt but assuming for purposes of the analysis that the anti-assignment clause in settlement-related agreements was for plaintiff's benefit]). Borrower bargained for limits on Apollo's broad discretion to assign the loan. Those limits benefit Borrower, and it is those limits we must look to in determining whether reading the implied covenant into the contract would negate the terms of the bargain (see Empresas, 680 F Supp 2d at 631-632; Norte, 2015 WL 7730980 at *10).

The parties negotiated two sets of restrictions that prohibited assignment to certain specified entities. Lender's exercise of its discretion in assigning the loan to Spruce, an entity not specifically prohibited from receiving the loan, did not deprive Borrower of the bargained-for limitations on transfer of the loan. Nor did Apollo attempt to structure a transaction that in effect accomplished such a transfer without constituting a formal assignment (see Empresas, 680 F Supp 2d at 631-632). Borrower negotiated to bar certain entities because such entities were competitors or for some other reason were considered by Borrower as problematic assignees. This bargain was adhered to and to further limit the discretion of Apollo to assign would negate the terms of the assignment clause.

Instead of this analysis, the majority turns the approach taken in Empresas and Norte on its head, claiming that because the parties only bargained for limits on "certain entities to whom the loan could not be assigned [that] does not suggest that the parties thereby authorized Apollo to assign the loan to anyone else for a fraudulent purpose or in bad faith—which is what plaintiff alleges" (majority op at 13 [emphasis in original]). The majority seems to suggest that a borrower putting an entity on a list of prohibited assignees has no relation to why the borrower would want that entity on the list. Under the majority's new rule, no longer does a borrower have to negotiate the exclusion of a competitor [*13]from the assignment clause as was done here and in Empresas. The borrower need only later claim bad faith in the assignment to a competitor based on the manner the competitor foreclosed on the loan and ask the court to supply the "implied" contract term. The majority's approach not only negates the terms of the clause here but puts into question the terms of thousands of similar clauses in commercial loan documents.

Even if implying the covenant of good faith did not negate the terms of the assignment clause, doing so is not needed to prevent the action taken by Apollo—exercising its discretion to assign the loan—from creating an unenforceable or illusory agreement (see In re January 2021 Short Squeeze Trading Litigation, 76 F4th at 1348). Spruce took the assignment subject to all the rights and obligations of the assignor, and Apollo, if it had held onto the loan, could have done all the acts attributed to Spruce after the assignment. If that action violated the terms of the loan agreement, those violations would give rise to an action against Spruce, as indeed was the case here (111 West 57th Investment LLC v W57 Mezz Investment LLC, 2025 NY Slip Op 33396[U] [Sup Ct, NY County 2025] [denying summary judgment to Spruce on derivative implied covenant claim under the Pledge Agreement, finding triable issues of fact as to whether Spruce suborned Sponsor not to object to the strict foreclosure]; see Norte, 2015 WL 7730980 at *10 [allowing the claims of substantive violations of the loan agreement to proceed]). That should—and prior to today, would—end the analysis.

Plaintiff's argument to the contrary rests on an allegation that the assignment was made to somehow further a "backroom deal"—that is, a plan to assign the loan to Spruce, have Spruce initiate a strict foreclosure, and arrange to have Sponsor withhold any objection (see majority op at 8 ["plaintiff alleges that Apollo violated the implied covenant under the Pledge Agreement by assigning the junior mezzanine loan to Spruce as part of a 'backroom deal' "]). But plaintiff makes no attempt anywhere—in the operative complaint, in the briefing, or at oral argument—to explain how the assignment itself was necessary for this alleged scheme, or how the assignment therefore deprived Borrower of the benefit of the "fruits" of the contract. Despite the majority's creative speculation (see e.g. majority op at 19 n 10 [Apollo did not want to make the "scheme . . . more obvious"]), plaintiff has not, and indeed cannot, articulate a reason why the assignment was necessary for the scheme to go forward. The assignment was neither a necessary step in the alleged scheme nor the mechanism by which the fruits of the mezzanine loan agreement were rendered illusory.

The majority's response, that "not every pleaded element of a scheme must be necessary to the scheme" (majority op at 19 n 10 ["Plaintiff does not allege that the assignment alone forms the basis for the breach of the implied covenant"]), confuses the factual allegations underlying the breach of contract claim with the alleged breach itself. The cause of action at issue states that Apollo "violated the implied covenant of good faith and fair dealing and therefore breached their obligations under the Pledge Agreement by assigning the Pledge Agreement to Spruce as part of the backroom deal" (emphasis added). The fundamental flaw in the majority's analysis is made clear by comparing the cause of action at issue here with one alleging that Spruce breached the implied covenant in the Pledge Agreement "by bribing the Borrower's managers not to exercise the . . . right to object to the strict foreclosure" (emphasis added). The breach alleged here is the assignment, not the "scheme." That conduct, as incorporated by reference in the cause of action, is meant to show why the assignment was in fact a breach, and failure to allege that the assignment was necessary to further the scheme is fatal to that claim.FN4

To find that the assignment rendered the contract illusory, the majority also recasts the purpose of the agreement as "facilitat[ing] the forbearance of the original mezzanine loan" (majority op at 18), and on that basis implies a "promise by Apollo not to use its discretion under the Pledge Agreement to collude in a 'backdoor deal' that stripped plaintiff of its position as an equity participant" in the joint venture (majority op at 18). The Forbearance Agreement, as amended, simply extended the forbearance period until June 29, 2017, and no party is alleged to have violated it; if the default was not cured during that time, the lender—or its assignee—could proceed against the collateral, which is precisely what Spruce did pursuant to the loan agreement. Plaintiff retained all its rights under the relevant agreements to contest that action. The claim that Apollo breached an implied covenant of good faith by assigning the Pledge Agreement to Spruce should be rejected.

It is clear the majority disapproves of the alleged conduct and feels plaintiff was taken advantage of, going so far as to compare this plaintiff, a subsidiary of AmBase Corporation formed to invest in a joint venture to "acquire and develop a luxury residential tower in New York City," to a municipal agency hiring painters or a student signing up to take a standardized test (majority op at 1, 11-13 nn 6, 7). Plaintiff had experienced counsel negotiate the terms of the JVA, including provisions related to fiduciary duties and decision-making authority, prior to making its $65 million equity investment. In the related litigation, the court rejected plaintiff's claims that the "backroom deal" violated the fiduciary duties owed by Sponsor under the JVA, and that whether to object to the strict foreclosure was a "major decision" requiring plaintiff's participation (see AmBase Corp. v 111 W. 57th Sponsor LLC, 2022 NY Slip Op 31503[U] [Sup Ct, NY County 2022]). Based on that determination, the Appellate Division below held that "plaintiff has failed to establish that the nonparty Sponsor breached either [the Major Decisions or the Fiduciary Waiver] provisions" (220 AD3d at 436), a holding that is not contested here. In sum, the courts have determined that plaintiff waived any relevant fiduciary duties and did not include objection to strict foreclosure as a major decision when it agreed to the negotiated contract terms. Additionally, plaintiff acting derivatively pursued claims for breach of the contract terms of the Junior Mezzanine Loan Agreement and one such claim survives against Spruce (111 W. 57th Inv. LLC v 111 W57 Mezz Inv. LLC, 2025 NY Slip Op 33396[U] [Sup Ct, NY County 2025]; see Norte, 2015 WL 7730980 at *10). Plaintiff pursued relief under both the JVA and the loan documents with varying degrees of success. There is no need for this Court to take the extraordinary step of rewriting a contract in its own image of good corporate citizenship.

III.

The parties here chose New York law to govern their agreement, going so far as to include an express waiver by Borrower of any claim that the law of another jurisdiction applied. But choice of law is just that, a choice. And one crucial reason parties to commercial contracts choose New York law is certainty (see Crair v Brookdale Hosp. Med. Ctr., Cornell Univ., 94 NY2d 524, 529 [2000] ["New York 'administers a known, stable, and commercially sophisticated body of law,' and such a forum 'may be considered as much an attraction to conducting business in New York as its unique financial and communications resources' "] [internal quotation marks and citations omitted]). That stability has helped make New York "the preeminent commercial center in the United States, if not the world," and in keeping with that status, "our courts have long deemed enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law" (159 MP Corp. v Redbridge Bedford, LLC, 33 NY3d 353, 359 [2019]). Accordingly, this Court has been careful to avoid rulings that would "engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world" (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 739 [2000]; see Ezrasons, Inc. v Rudd, 44 NY3d 532, 551 [2025] ["one need not look very far for proof that aggressive meddling with the rules by which our financial system has long operated poses risks to (New York's) status and to our economy"]). Today's majority holding runs counter to that institutional concern for stability, creating market uncertainty by rewriting a contract clause negotiated between well-represented, sophisticated parties as part of a commercial loan transaction to align with the Court's notion of fairness. This majority may believe doing so is a good idea. Contracting commercial parties with a choice of law may not share that view.

Order appealed from and so much of the Appellate Division order brought up for review modified, without costs, by reinstating the second cause of action of the second amended complaint and remitting to Supreme Court, New York County, for further proceedings on that cause of action and, as so modified, affirmed. Opinion by Chief Judge Wilson. Judges Rivera, Troutman and Ogden concur. Judge Garcia dissents in part and votes to affirm in an opinion, in which Judges Singas and Cannataro concur. Judge Halligan took no part.

Decided May 28, 2026

Footnotes

Footnote 1

The Apollo entities include ACREFI Mortgage Lend, LLC, Apollo Credit Opportunity Unity Fund III AIV I LP and AGRE Debt 1.

Footnote 2

As specified in section 8.27 of the Loan Agreement, the Loan Agreement, Forbearance Agreement, Pledge Agreement, and other Loan Documents were all parts of a single integrated agreement. The Pledge Agreement, like the Loan Agreement, defined the "Loan Documents"—"the Note, the Loan Agreement, [the Pledge] Agreement, the UCC-1 Financing Statements and the other documents and instruments entered into in connection with the Loan"—all of which were necessary components to refinance the original mezzanine loan. Additionally, the terms of the Pledge Agreement and the Loan Agreement reference one another for definitions, and the Pledge Agreement several times notes that various rights are subject to the terms of the Loan Documents.

Footnote 3

The merits of this dispute, as well as other rights of plaintiff under the JVA, are the subject of other related and ongoing actions.

Footnote 4

Notably, the dissent agrees (dissenting op at 7 ["As an initial matter, I agree that the granting of 'sole discretion' to the lender is not the final word on whether we should imply the covenant of good faith and fair dealing here"]).

Footnote 5

We do not alter or put into question the specific rule treating sole discretion to terminate a contract as a distinct right immune from the implied covenant (see e.g. Vendome v. Oldenburg, 198 AD3d 450, 451 [1st Dept 2021]; ELBT Realty, LLC v. Mineola Garden City Co. 144 AD3d 1083, 1084 [2d Dept 2016]; Chrysler Credit Co. v Dioguardi Jeep Eagle, Inc., 192 AD2d 1066, 1067 [4th Dept 1993]; Burdett Radiology Consultants, P.C. v. Samaritan Hosp., 158 AD2d 132, 136 [3d Dept 1990]). Moreover, although we adopt the general rule that a contract's grant of sole discretion does not per se extinguish the implied covenant, the terms of a specific grant of contractual sole authority will, along with the terms of the contract as a whole, inform the determination of the scope of any implied duty.

Footnote 6

The dissent contends that because the parties in this case are more sophisticated than those in Dalton, we improperly "extrapolate" Dalton's rule that "the more discretion you bargain for, the more likely the covenant of good faith will be applied to limit it" (dissenting op at 8). But the dissent misstates the rule. It is not that a court is more likely to imply such a covenant in the face of more discretion, but there may be more reason for a court to imply the covenant in the face of more discretion, because more discretion affords a wider range of actions able to destroy the parties' bargain.

Footnote 7

The dissent repeatedly emphasizes that plaintiff is not "a municipal agency hiring painters . . . or a student signing up to take a standardized test" as if sophistication of the parties is something not accounted for by the case law (dissenting op at 15; see also dissenting op at 2, 8). A court's evaluation of whether to imply a covenant of good faith and fair dealing already is analyzed from the viewpoint of a reasonable person in the position of the promisee (Cordero, 39 NY3d at 409), and thus already compensates for the distinction the dissent continuously and unsuccessfully uses to differentiate this case. If anything is going to "jeopardize[]" New York's standing as "the preeminent commercial center in the world" (dissenting op at 2), it is a court decision which infers, as the dissent does, that the expectations of sophisticated parties are less worth protecting.

Footnote 8

The dissent highlights two cases which "consider[] the covenant in the context of an assignment clause granting broad discretion to lenders" because it finds the cases "are instructive both for the clarity they bring to the issue and for highlighting the flaws in the majority's analysis" (dissenting op at 9). But both cases support our analysis. In Empresas Cablevision, S.A.B. de C.V. v JPMorgan Chase Bank, N.A. (680 F Supp 2d 625 [SD NY 2010]) the assignment clause in the loan agreement included restrictions regarding whom the lender may re-assign the loan. The lender then "negotiated an agreement with [a third party] that, while it took the form of a participation, gave [said third party] much of the substance of the forbidden assignment and purposely undercut what [the lender] knew the assignment veto was designed to prevent" and the court found the implied covenant was breached because the lender's action represented "an end-run, if not a downright sham" that "does away with the 'fruits' of the contract" (id. at 632). In Empresas, as alleged here, that lender did something inconsistent with the purpose of the contract, even if not inconsistent with the direct terms of the contract, and the Empresas court held that lender violated the implied covenant. In Norte v Worldbusiness Capital, Inc. (2015 WL 7730980 [SD NY 2015]), the assignment clause in the loan agreement did not include any restrictions regarding whom the lender could re-assign the loan. The lender then assigned the loan to the borrower's competitor, and borrower claimed that the lender violated the implied covenant (id.). The Norte court found the borrower failed to state a breach of the implied covenant because "in the absence of a provision prohibiting assignment to a specific party, [the defendant] . . . was permitted to assign the loan to whomever it wished" (id. at *10). In other words, there, and unlike here, the lender's assignment was consistent with the explicit terms of the contract and so "reading the implied covenant into the contract would negate the bargained-for terms of the assignment clause" (dissenting op at 10). Thus, in neither case was the fact the assignment clause did or did not contain certain restrictions regarding whom the loan could be assigned dispositive of whether the alleged conduct by the defendant violated an implied covenant. What mattered in each case and here, was whether the conduct alleged to have violated the implied covenant was consistent with the overall terms and purpose of the contract. As a result, we do not "turn[] the approach taken in Empresas and Norte on its head," and "suggest that a borrower putting an entity on a list of prohibited assignees has no relation to why the borrower would want that entity on the list" or that a borrower no longer has "to negotiate the exclusion of a competitor from the assignment clause as was done here and in Empresas" (dissenting op at 12). Rather, we suggest that, exactly as in Empresas, a party pleads a cause of action for breach of the implied covenant when it sufficiently alleges that its counter-party has partaken in conduct which, even if consistent with the bargained for terms of the contract, violated an unexpressed promise consistent with the agreement and "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Singh, 40 NY3d at 145-146) and was "inconsistent with the other terms of the contractual relationship" (Dalton, 87 NY2d at 389).

Footnote 9

The dissent takes issue with our articulation of the purpose of the Pledge Agreement. Stating that "[t]he Forbearance Agreement, as amended, simply extended the forbearance period until June 29, 2017, and no party is alleged to have violated it; if the default was not cured during that time, the lender—or its assignee—could proceed against the collateral, which is precisely what Spruce did pursuant to the loan agreement" (dissenting op at 15), the dissent implies the forbearance agreement's sole purpose is to buy time. This overlooks what time was meant to protect—plaintiff's investment. Likewise, the Loan Agreement, Forbearance Agreement, Pledge Agreement, and other Loan Documents were all parts of a single integrated agreement, and thus were integrated in purpose.

Footnote 10

The dissent contends that nowhere does the complaint explain how the "assignment itself was necessary for this alleged scheme" or that the "assignment therefore deprived Borrower of the benefit of the 'fruits' of the contract" (dissenting op at 13). That contention is inapposite for several reasons. First, not every pleaded element of a scheme must be necessary to the scheme. Plaintiff does not allege that the assignment alone forms the basis for the breach of the implied covenant, but rather that the "assign[ment of] the Pledge Agreement to Spruce [w]as a part of a backroom deal" that caused the breach. Even leaving the assignment aside, the complaint's remaining allegations sufficiently allege a scheme to induce the Sponsor to refuse to object to the strict foreclosure, and sufficiently allege Apollo's involvement in that scheme. Apollo's financial models advertised the strict foreclosure to Spruce, Apollo's cooperation was necessary for the additional forbearance immediately after Spruce's purchase, and so on. Second, it is evident from the complaint that Apollo would not have exchanged, through a strict foreclosure, its $325 million in debt in exchange for the much smaller equity interest held by plaintiff. For that reason, assigning a small portion of the debt to someone—small enough that exchanging it for plaintiff's equity through a strict foreclosure would have provided a significant windfall to induce an investor (Spruce, in this case) to purchase distressed debt at par and immediately exchange the debt for equity. Third, had Apollo created an entity of its own and assigned $25 million of the debt to that entity, and then had the new entity strictly foreclose, the scheme would have been more obvious. Whether plaintiff can prove any of its allegations is a wholly different matter.

Footnote 11

In a final effort to explain why the implied covenant claim in this case was not sufficiently pleaded, the dissent refers to all the other contract claims the plaintiff pleaded, and could have pleaded, in this action and a related action. But the existence of other causes of action arising out of the same conduct, unless duplicative to the action at hand, are irrelevant to our evaluation, and any overlap in damages would be considered at a later stage.

Footnote 1

I concur in result on the tortious interference claims for reasons stated by Justice Cohen below, namely that the economic interest defense bars these claims as a matter of law because Apollo and Spruce, as secured lenders, had "a right to protect [their] own legal or financial stake in the breaching party's business," and plaintiff failed to allege that either Spruce or Apollo took actions that "were motivated by malice, fraud, or illegal means" (111 West 57th Investment LLC v 111 W57 Mezz Investor LLC, 2022 NY Slip Op 34258[U], *6 [Sup Ct, NY County 2022] [internal citations omitted]). The majority's one-sentence holding that "[w]e affirm the dismissal of the tortious interference claims against both defendants on the ground that they are insufficiently pleaded" (majority op at 20) is without supporting analysis and notably omits any reference to our "liberal pleading standard" (majority op at 16 [applying that standard to the implied covenant claim]).

Footnote 2

At least one jurisdiction refuses to recognize the implied covenant of good faith and fair dealing out of concern that "[a]doption of this covenant in every contract would abolish our system of government according to settled rules of law and let each case be decided upon what might seem fair and in good faith, by each fact finder" (Barrow-Shaver Res. Co. v Carrizo Oil & Gas, Inc., 590 SW3d 471, 491 [Tex 2019] [internal quotation marks and citation omitted]). Until today, New York addressed the risk of having contracts rewritten to conform to a court's subjective view of business ethics by refusing to imply conditions inconsistent with the contract's terms and by imposing a heavy burden on a party seeking to import the common law covenant into a written contract (see Moran v Erk, 11 NY3d 452, 456-459 [2008]).

Footnote 3

Even this disciplined approach to reading the covenant of good faith into an assignment clause has been criticized as "creat[ing] uncertainty in the market" (Kibbe, Fraser and Rosen, Court Tests a Borrower's Ability to Block Loan Transfers to Competitors, 64 Consumer Fin Law Quarterly 227, 230 [Summer/Fall 2010]). Of course, going forward, federal courts interpreting commercial contracts must apply the majority's new rule where the parties have chosen New York law.

Footnote 4

There could be no better summary of the majority's approach than the statement that "[e]ven leaving the assignment aside, the complaint's remaining allegations sufficiently allege a scheme" (majority op at 19 n 10). That is precisely what the majority does, ignores the alleged breach of the contract and instead focuses on "bad" behavior.